**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARIYAH GREEN and SHAVON GIBSON | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. |
| v. | ) ) | Jury Demand |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO; THE DAVID LYNCH FOUNDATION; and THE UNIVERSITY OF CHICAGO, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## **COMPLAINT**

NOW COME the Plaintiffs, MARIYAH GREEN ("Green") and SHAVON GIBSON ("Gibson"), by their attorneys, MAUCK & BAKER, LLC, and hereby complain of Defendants BOARD OF EDUCATION OF THE CITY OF CHICAGO ("CPS" or "Board"), THE DAVID LYNCH FOUNDATION FOR CONSCIOUSNESS-BASED EDUCATION AND WORLD PEACE ("DLF"), and THE UNIVERSITY OF CHICAGO ("University") (collectively "Defendants"), as follows:

## **PROCEDURAL BACKGROUND**

An Amended Class Action Complaint was filed on September 25, 2020, in the Northern District, case 20-cv-04540 (also referred to as "Williams litigation"), for the purpose of bringing a class action against Defendants on behalf of students wronged by the Quiet Time program in the public schools. On December 15, 2022, Judge Matthew Kennelly denied the motion of Amontae

Williams, Plaintiff in the *Williams* litigation, to allow *inter alia*, Plaintiffs, Mariyah Green and her mother, Shavon Gibson, to act as substitute class representatives for the respective student and parent proposed classes and instructed the parties that a new Complaint by these Plaintiffs named herein (and possibly others) might be the best procedural step. Hence, this case is filed. (Document identification numbers herein refer to those used in Case No. 20-cv-04540).

## **INTRODUCTION**

1. Plaintiffs seek redress under 42 U.S.C. § 1983 for deprivations of their constitutional rights under the First and Fourteenth Amendments to the United States Constitution. Plaintiffs also seek redress for violations of the Illinois Religious Freedom Restoration Act, 775 ILCS 35/1, *et seq.*, the Illinois Constitution, and common law.

2. All Defendants violated the Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution and other legal protections for students when they collaborated to implement and facilitate a Hinduistic religious program they called the "Quiet Time" within eight CPS schools.

3. The "Quiet Time" program, which encompassed the practice of "Transcendental Meditation" and the repetition of "mantras" is fundamentally religious in nature. *Malnak v. Yogi*, 440 F. Supp. 1284 (D.N.J. 1977); aff'd by *Malnak v. Yogi*, 592 F.2d 197 (3d Cir. 1979) (*per curiam*).

4. During the design, implementation, and conduct of Quiet Time, the David Lynch Foundation knew, and Chicago Public Schools and the University of Chicago knew or should have known that *Malnak* had adjudicated Transcendental Meditation to be a religion and pursuant to the Establishment Clause, had resulted in Transcendental Meditation being removed from all public schools in New Jersey. *Id.*

5. Plaintiffs' rights under the First Amendment were violated when the Board, The David

Lynch Foundation, and the University created, abetted, enabled, and/or profited from hundreds of thousands of actions coerced upon students within public schools where Hindu beliefs and the practice of "Transcendental Meditation" were being conducted. Plaintiff Green was coerced to engage in religious practices against her will and the coercion and religious practices interfered with Gibson's constitutional rights to direct the religious education of her child as a parent of Green. *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

6. By collaborating to implement and facilitate the "Quiet Time" program within certain CPS schools, Defendants also violated the Illinois Religious Freedom Restoration Act by substantially burdening the religious free exercise rights of CPS students and the parents and/or legal guardians of minor CPS students, and the fundamental rights protected by the Illinois Constitution.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343.

8. This Court has supplemental jurisdiction over the substantially related state law matters under 28 U.S.C. § 1367(a).

9. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred within the Northern District of Illinois.

## PARTIES

10. Plaintiff Mariyah Green is a former CPS student who graduated from a CPS school that hosted the "Quiet Time" program. Prior to her graduation, she participated in the "Quiet Time" program implemented at her CPS school.

11. Plaintiff Shavon Gibson is mother of Mariyah Green.

3

12. Defendant Board of Education of the City of Chicago ("CPS") is the board of the fourth largest school district in the United States. CPS recently reported overseeing 652 schools, elementary and high schools with an enrollment of over 355,000 students.

13. Defendant David Lynch Foundation is an Iowa not-for-profit corporation headquartered in New York City and registered to do business in Illinois and a 501(c)(3) organization with, during the times relevant to this complaint, a stated mission of "promoting widespread implementation of the . . . Transcendental Meditation (TM) program" with a specific focus on "inner-city students."[1] **EXHIBIT 1**. DLF's program seeking implementation within Chicago Public Schools was known as "Quiet Time" ("QT"). On its website, DLF stated that it has successfully aided the implementation of the Quiet Time program in "hundreds of public, private and charter schools worldwide" and the organization solicits donations to pursue its intention to "expand the Quiet Time program in the U.S. and around the world."[2] **EXHIBIT 2**. On its website, DLF also identified Chicago as one of four locations where the organization is particularly interested "to expand the network of schools with Quiet Time programs."[3] **EXHIBIT 3**.

14. Defendant University of Chicago, an Illinois not-for-profit corporation, acting through the Crime and Education Labs of the University of Chicago Urban Labs, worked collaboratively with Defendants the Board and DLF to plan and conduct a research project designed to implement the "Quiet Time" program within multiple CPS schools. The University of Chicago Urban Labs is a group of five research laboratories working "to address challenges across five key dimensions of urban life: crime, education, health, poverty, and energy & environment." Urban Labs "partner[s]

---

[1] "About DLF," last visited January 9, 2023, https://www.davidlynchfoundation.org/about-us.html.
[2] "Quiet Time with Transcendental Meditation in Schools," last visited July 20, 2020, https://www.davidlynchfoundation.org/schools.html.
[3] "Funding Guidelines Underserved Schools," last visited September 1, 2021, https://www.davidlynchfoundation.org/funding-guidelines-underserved-schools.html

with civic and community leaders to identify, test, and help scale the programs and policies with the greatest potential to improve human lives." The University also has a separate and standing "Master Services Agreement" executed in 2015 with the Board requiring the University to "rigorously evaluate" all studies involving CPS students. **EXHIBIT 4,** Bates BOE 1231-1251 ("University Master Services Agreement").

## COMMON ALLEGATIONS

15. Although CPS is a governmental entity and, upon information and belief, DLF and the University of Chicago are private entities, all defendants acting in concert were acting under color of law during the time periods relevant to this action. *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980).

16. TM is a specific type of silent religious meditation, involving the use of mantras, that was developed by Maharishi Mahesh Yogi in India in the 1950s.

17. Proponents of TM claim that the technique can help students to improve academic performance and reduce stress and violence.

18. DLF created the "Quiet Time" program as a potential vehicle to enable teaching of TM in public schools, such as the CPS schools in question, despite knowing of the religious elements of TM and the "Quiet Time" program.

19. By proposing that the "Quiet Time" program be facilitated within CPS schools, DLF knew or should have known that they would be violating the First Amendment Establishment and Free Exercise rights of vulnerable CPS students, including minor students. Despite this knowledge, DLF coordinated with the University of Chicago Urban Labs to propose implementation of the "Quiet Time" program within CPS schools.

20. DLF submitted to the University of Chicago Urban Labs a proposal to run a research project involving operation of the "Quiet Time" program and TM within certain CPS schools.

21. The University of Chicago Urban Labs, or those at the University responsible for "rigorous evaluation" in considering the DLF proposal, became or should have become familiar with the religious elements of TM and the "Quiet Time" program as part of their vetting process prior to implementing Quiet Time in CPS schools.

22. By proposing that the "Quiet Time" program be facilitated within CPS schools, the University of Chicago Urban Labs knew or should have known that they would be violating the First Amendment rights of vulnerable CPS minor students and parents of minor students. Despite this knowledge, the University of Chicago Urban Labs approached CPS to propose implementation of the "Quiet Time" program within CPS schools.

23. The University of Chicago Urban Labs agreed to run the proposed research project and worked in agreement with DLF to jointly propose the Quiet Time program to the Board.

24. By agreeing to facilitate the "Quiet Time" program within CPS schools, CPS knew or should have known that they would be violating the First Amendment rights of CPS students and parents of minor students. Despite this knowledge, CPS agreed to allow the University of Chicago Urban Labs and DLF to implement the "Quiet Time" program within CPS schools.

25. After CPS agreed to allow the "Quiet Time" program, then it, the University of Chicago Urban Labs, and DLF worked collaboratively to establish parameters for and implement the "Quiet Time" program within CPS schools.

26. The "Quiet Time" program took place during regular school hours and utilized both regular classrooms and other rooms all located in the school buildings which were specifically designated by CPS personnel for the exclusive use of the program. DLF staff and agents had their own designated rooms within CPS schools, as assigned by CPS personnel, where students could hang out with DLF staff and received incentives to participate in the Quiet Time.

27. The "Quiet Time" program was designed to provide instruction in—and to facilitate the practice of—"Transcendental Meditation" by CPS students.

28. All University staff who visited "Quiet Time" classrooms were trained in TM since the outset of the program in the fall of 2015.

29. Many CPS principals and staff were trained in TM since the outset of the program in the fall of 2015.

### *"Puja" Initiation Ceremony*

30. The practice of "Transcendental Meditation," as a mandatory prerequisite for any person desiring engagement in it, requires participation in an initiation ceremony, known as a "Puja." DLF refers to the Puja as an "expression of gratitude" ceremony to the long dead founders of TM.

31. The Merriam-Webster dictionary defines "puja" as:

> (1) "a Hindu act of worship or propitiation" and

> (2) "a Hindu rite or religious festival."[4]

The Oxford dictionary defines "puja" as:

> (1) "a Hindu ceremony of worship" and

> (2) "an offering (=a gift that is given to a god) at the ceremony."[5]

The "[p]lain meaning can be determined by using a dictionary." *Sanders v. Jackson*, 33 F. Supp. 2d 693, 696 (N.D. Ill. 1998), aff'd, 209 F.3d 998 (7th Cir. 2000).

32. "Puja" initiation ceremonies must be led by "Transcendental Meditation" instructors,

---

[4] Merriam-Webster Dictionary, definition of "puja," last visited on January 10, 2023, https://www.merriam-webster.com/dictionary/puja.
[5] Oxford Learner's Dictionary, definition of "puja," last visited on January 10, 2023, https://www.oxford-learnersdictionaries.com/us/definition/english/puja.

who are certified by the Maharishi Foundation USA, a 501(c)(3) organization founded by Maharishi Mahesh Yogi. To staff the Quiet Time program and teach TM at CPS, DLF contracted exclusively with instructors so certified to teach TM.

33. During a "Puja" initiation ceremony, various bowls, food items, and symbolic items are arranged around a picture of Guru Dev, a former teacher of Maharishi Mahesh Yogi and another founder of Transcendental Meditation.



**"Puja" shrine constructed around an image of Guru Dev**

34. During a "Puja" initiation ceremony, specific items are presented to the picture of Guru Dev while the "Transcendental Meditation" instructor chants aloud in Sanskrit for about three to five minutes and performs certain rehearsed ritual movements.

35. At CPS schools, "Puja" initiation ceremonies involving either individual or small groups of students were performed in private by the certified "Transcendental Meditation" instructors without a CPS staff member present.

36. CPS students were regularly asked by the instructors to participate in the "Puja" by placing various items before the image of Guru Dev or to kneel before that image.



**Swami Brahmananda Saraswati, also known as Guru Dev, is shown in the Puja ceremony framed image, to which students were told to make their offerings. He was the teacher of the TM founder, Maharishi Yogi.**

37. "Guru" is a title which means:

(1) "A personal religious teacher and spiritual guide in Hinduism"

(2) (a) "A teacher and especially intellectual guide in matters of fundamental concern"

(b) "One who is an acknowledged leader or chief proponent"

(c) "A person with knowledge or expertise"[6]

"Dev" is a title stemming from "Deva" which means "[a] divine being or god in Hinduism and Buddhism."[7]

38. The certified "Transcendental Meditation" instructors routinely identified the person appearing in the photograph displayed on the table as "Guru Dev."

---

[6] Merriam-Webster Dictionary, last visited on January 10, 2023, https://www.merriam-webster.com/dictionary/guru?utm_campaign=sd&utm_medium=serp&utm_source=jsonld.
[7] Merriam-Webster Dictionary, last visited on January 10, 2023, https://www.merriam-webster.com/dictionary/deva.

39. The certified "Transcendental Meditation" instructors did not explain the significance of presenting various items to the photograph displayed on the table.

40. CPS students were asked to remain present while the certified "Transcendental Meditation" instructor performed a ritual involving the chanting of Sanskrit words coordinated with certain rehearsed movements. Such instructors knew the English translation of the Sanskrit words.

41. The certified "Transcendental Meditation" instructors all knew but did not explain the English meaning of the Sanskrit words they were chanting during the "Puja" initiation ceremony. Even when asked by students, the instructors were trained to avoid disclosing the meaning to students.

42. When translated into English, the Sanskrit words chanted during the "Puja" initiation ceremony contain, among other things, statements recognizing the power possessed by various Hindu deities and invitations to those same Hindu deities to channel their powers through those in attendance at the "Puja" initiation ceremony. An accurate translation of the Sanskrit words is:

> Invocation
> Whether pure or impure, where purity or impurity is permeating everywhere, whoever opens himself to the expanded vision of unbounded awareness gains inner and outer purity.
>
> Invocation
> To Lord Narayana, to lotus-born Brahma the Creator, to Vashishtha, to Shakti and his son Parashar,
>
> To Vyasa, to Shukadeva, to the great Gaudapada, to Govinda, ruler among the yogis, to his disciple,
>
> Shri Shankaracharya, to his disciples Padma Pada and Hasta Malaka
>
> And Trotakacharya and Vartika-Kara, to others, to the tradition of our Master, I bow down.

To the abode of the wisdom of the Shrutis, Smritis and Puranas, to the abode of kindness, to the personified glory of the Lord, to Shankara, emancipator of the world, I bow down.

To Shankaracharya the redeemer, hailed as Krishna and Badarayana, to the commentator of the Brahma Sutras, I bow down. To the glory of the Lord I bow down again and again, at whose door the whole galaxy of gods pray (sic) for perfection day and night.

Adorned with immeasurable glory, preceptor of the whole world, having bowed down to Him we gain fulfillment.

Skilled in dispelling the cloud of ignorance of the people, the gentle emancipator, Brahmananda Sarasvati, the supreme teacher, full of brilliance, Him I bring to my awareness.

Offering the invocation of the lotus feet of Shri Guru Dev, I bow down.

Offering a seat to the lotus feet of Shri Guru Dev, I bow down.

Offering an ablution to the lotus feet of Shri Guru Dev, I bow down.

Offering a cloth to the lotus feet of Shri Guru Dev, I bow down.

Offering sandalpaste to the lotus feet of Shri Guru Dev, I bow down.

Offering full rice to the lotus feet of Shri Guru Dev, I bow down.

Offering a flower to the lotus feet of Shri Guru Dev, I bow down.

Offering incense to the lotus feet of Shri Guru Dev, I bow down.

Offering light to the lotus feet of Shri Guru Dev, I bow down.

Offering water to the lotus feet of Shri Guru Dev, I bow down.

Offering fruit to the lotus feet of Shri Guru Dev, I bow down.

Offering water to the lotus feet of Shri Guru Dev, I bow down.

Offering a betel leaf to the lotus feet of Shri Guru Dev, I bow down.

Offering a coconut to the lotus feet of Shri Guru Dev, I bow down.

Offering camphor light

White as camphor, kindness incarnate, the essence of creation garlanded with Brahman, ever dwelling in the lotus of my heart, the creative impulse of cosmic life, to That, in the form of Guru Dev, I bow down.

Offering light to the lotus feet of Shri Guru Dev, I bow down.

Offering water to the lotus feet of Shri Guru Dev, I bow down.

Offering a handful of flowers.

Guru in the glory of Brahma, Guru in the glory of Vishnu, Guru in the glory of the great Lord Shiva, Guru in the glory of the personified transcendental fulness (sic) of Brahman, to Him, to Shri Guru Dev adorned with glory, I bow down.

The Unbounded, like the endless canopy of the sky, the omnipresent in all creation, by whom the sign of That has been revealed, to Him, to Shri Guru Dev, I bow down.

Guru Dev, Shri Brahmananda, bliss of the Absolute, transcendental joy, the Self-Sufficient, the embodiment of pure knowledge which is beyond and above the universe like the sky, the aim of 'Thou art That' and other such expressions which unfold eternal truth, the One, the Eternal, the Pure, the Immovable, the Witness of all intellects, whose status transcends thought, the Transcendent along with the three guras, the true preceptor, to Shri Guru Dev, I bow down.

The blinding darkness of ignorance has been removed by applying the balm of knowledge. The eye of knowledge has been opened by Him and therefore, to Him, to Shri Guru Dev, I bow down.

Offering a handful of flowers to the lotus feet of Shri Guru Dev, I bow down.

*Malnak*, 440 F.Supp. at 1306 -07, *supra* at 2.

43. The same Sanskrit words identified and translated in *Malnak* were chanted in the Puja ceremonies in CPS schools.

44. Proponents of "Transcendental Meditation" consider the "Puja" initiation ceremony integral to the practice of "Transcendental Meditation" because the "Puja" establishes the necessary connection between a practitioner, such as a CPS student, and the entities that ultimately make the technique effective.

45. Green and every CPS student that participated in the TM portion of the "Quiet Time" program was required to participate in a "Puja" initiation ceremony.

46. The certified "Transcendental Meditation" instructors took steps to ensure that the

spaces used for "Puja" initiation ceremonies remained private, by keeping doors closed, turning off the lights during the "Puja," and covering windows to block any outside view into the rooms.

### *Mantras*

47. The practice of "Transcendental Meditation" involves silent meditation, with encouragement to mentally repeat an assigned mantra to assist in the meditative process.

48. During meditation, "Transcendental Meditation" practitioners are taught to silently repeat their mantras.

49. Certified "Transcendental Meditation" instructors routinely told CPS students that the mantras given to them are "meaningless sounds."

50. Green and other CPS students were also told that they should only utilize a mantra that had been uniquely assigned to them by a certified "Transcendental Meditation" instructor.

51. The specific mantra assigned to a particular student is chosen by the instructors according to criteria which the instructors refuse to disclose even though they maintain the mantra is "meaningless." The students were also told they could not choose a mantra of their own, even though the assigned mantra was supposedly meaningless.

52. During their respective "Puja" initiation ceremony, the CPS students were taught how to pronounce their assigned mantra but were not given the meaning or significance behind the Sanskrit words themselves.

53. The attached chart depicts some of the mantras used in TM and the Hindu deities to which mantras are names of. **EXHIBIT 5** at 2.

54. Mantras are drawn from a select pool of Sanskrit words most of which honor or reference specific Hindu deities.

55. For example, the "Aim" mantra is associated with the deity, Saraswati, who is the

13

Hindu goddess of knowledge, music, art, wisdom, and learning.

56. Green and other CPS students that participated in the TM portion of the "Quiet Time" program were assigned a mantra and instructed to silently repeat it whenever engaged in CPS meditation sessions.

57. Plaintiff Mariyah Green, former participant in Quiet Time at Bogan High School, testified that while she was a student, she researched her and her classmates' mantras and learned they "were actually the names of Hindu Gods." **EXHIBIT 6**, (Hudgins Dep. 45:15-16, March 11, 2022).

### *Secretive Nature*

58. The practice of "Transcendental Meditation" at CPS schools always involved asking the student to take an oath to secrecy.

59. "Transcendental Meditation" practitioners are told by TM instructors to keep secret any details of what they heard, saw, or experienced during the "Puja" initiation ceremony.

60. "Transcendental Meditation" practitioners, as part of their Puja training, are instructed to not reveal their mantras to others.

61. "Transcendental Meditation" practitioners are warned to not recount to others any of their private interactions with certified "Transcendental Meditation" instructors and that failing to keep the oath to secrecy would render the practice of "Transcendental Meditation" wholly ineffective.

62. Every CPS student that participated in the "Quiet Time" program was instructed to keep their experiences with respect to the program secret from others, including their parents, legal guardians, other students, and their friends.

63. Ms. Kaya Hudgins, a witness in Case No. 20-cv-04540 who has also filed a riposte lawsuit, testified in her deposition that the TM instructors "told us not to tell anyone" their mantras. **EXHIBIT 6**,

(Hudgins Dep. 45:14-15, March 11, 2022).

### *CPS Meditation Sessions*

64. The "Quiet Time" program involved requiring CPS students to engage in two 15-minute meditation group sessions, one in the morning and one in the afternoon every school day.

65. During each CPS meditation session, students who were part of the TM program within "Quiet Time" were instructed to be silent and repeat in their minds their personal mantras during "Quiet Time" sessions.

66. Whenever a certified "Transcendental Meditation" instructor was not available for a particular classroom during a scheduled meditation session, the CPS teacher assigned to that classroom was required by CPS to oversee the meditation session as part of their employment with CPS.

67. The oversight of a meditation session regularly involved ringing a small handheld bell, also known as a "Ghanta," or ritual bell, commonly used in Hinduistic religious practices, which was rung by the certified "Transcendental Meditation" instructor or assigned CPS teacher to indicate the beginning and conclusion of each CPS meditation session.

68. In the Hindu belief system, bells are often used to indicate a desire to interact with a deity and to prepare a listener's mind for said interaction.

69. CPS teachers enabled TM meditation and required non-meditating students to enable TM meditation because the oversight of a meditation session required the CPS teacher or TM instructor to keep non-meditators quiet, telling them they should be quiet to avoid disturbing the meditation of others.

70. CPS, the University of Chicago Urban Labs, and DLF all made representations, both directly and indirectly, to students, parents, legal guardians, and staff that "Transcendental Meditation" was "non-religious."

15

71. By failing to disclose the religious nature of the "Quiet Time" program, students, parents, and legal guardians were not given a fair opportunity to decide whether to opt out of participation in the program. discussing the hidden religious nature of "Transcendental Meditation," and the "Quiet Time" program by extension, are attached and incorporated by reference as **EXHIBITS 5 & 7.**

72. The religious portions of TM interfered with the rights of CPS students to have the advice and protection of their parents in the directing of their religious education.

### *Health Questionnaire*

73. The CPS students were placed in either a "control" group or "treatment" group by the University. The "treatment" group was required to learn and practice TM meditation.

74. Both control group and TM-required meditation students, or the "treatment" group, had to submit a Health Questionnaire (**EXHIBIT 8**, Univ 000107-114), which contained questions certainly embarrassing to adolescents which touched on sexual development and asked about weight, growth of body hair, comparison to classmates—and for girls, menstruation, and breast development.

75. Although this document was developed by the Urban Labs to "analyze your data" (see introductory paragraph of document), it was distributed in the CPS schools as part of the DLF "Quiet Time" (the document is titled "Quiet Time Study – Student Health Form").

76. No parental approvals for use of the questionnaire were furnished by Defendants in the *Williams* litigation and no request for approval—even an "opt-out"—has been produced by any Defendant.

### (1) ALLEGATIONS AS TO MARIYAH GREEN

77. Plaintiff Mariyah Green has prepared a declaration that is attached and incorporated by reference as **EXHIBIT 9.**

78. Plaintiff was a former CPS student attending Bogan Computer Technical High School

16

("Bogan") as a junior and a senior *beginning* in September 2018 and graduating in the spring of 2020.

79. Plaintiff regularly attended a Christian church with her family and was raised within the Christian faith.

80. At the beginning of her junior year at Bogan, Plaintiff first encountered the "Quiet Time" program, when she was 16 years old, which was being run at the school.

81. Plaintiff learned of the hidden religious nature of the "Quiet Time" program and shared that information with other CPS students, as well as Bogan teachers. When Bogan teachers approached Green to remind her to meditate, Green told them that it was not normal and asked them why they were not learning.

82. As Plaintiff had transferred to Bogan for its basketball program and knew she had to get good grades to stay on this basketball team, Plaintiff felt like she was forced to participate in "Quiet Time" daily as she was told that cooperation during the "Quiet Time" would count towards her grades and she did not want to be kicked off the basketball team for bad grades.

83. The hallway of Bogan had a billboard with an advertisement promoting the benefits of "Quiet Time," and Plaintiff felt alone and angry when her opinions regarding "Quiet Time" were not respected and she was not given a choice whether she could participate or not.

84. The second day of the TM training, Mariyah Green told the TM instructor that her knee was injured in order to avoid kneeling before the image of a man in a photograph on a table in the middle of the room who looked like Buddha, as it was against Green's religion to kneel before anyone except for Jesus Christ.

85. The above declaration demonstrates some of the ways Plaintiff and other students were coerced to engage in Hindu religious practices and rituals in violation of their rights under both the Establishment and Free Exercise Clauses.

**(2) <u>ALLEGATIONS AS TO SHAVON GIBSON</u>**

86. Plaintiff Shavon Gibson has prepared a declaration that is attached and incorporated by reference as **<u>EXHIBIT 10</u>**.

87. Plaintiff is the mother of Mariyah Green.

88. Plaintiff is an active participant within a Christian church and strongly identifies with the Christian faith.

89. As a parent, Plaintiff has gone to great lengths to direct the religious education of Mariyah Green.

90. When Plaintiff enrolled Mariyah Green into CPS schools, Plaintiff did not anticipate that CPS, a secular and governmental entity, would interfere in the religious education of her child.

91. When Plaintiff first learned of the existence of the "Quiet Time" program and its connection to practices and beliefs based in Hinduism, Plaintiff was angered by the intrusion into her child's religious education and coercion toward a belief system that is inconsistent with her personal faith and the religious practices of her family and immediately instructed Mariyah Green to contact her pastor.

92. The declaration above-described conduct demonstrates some of the ways Defendants, by facilitating religious practices and *rituals* that are based in Hinduism, interfered with Plaintiff's parental right to direct the religious education of her CPS-student child, in violation of Plaintiff's rights under both the Establishment and Free Exercise Clauses <u>and as articulated in *Wisconsin v. Yoder*, 406 U.S. 205 (1972).</u>

**(3) <u>THE PRIVATE DEFENDANTS' COLLABORATION WITH THE BOARD OF EDUCATION</u>**

93. The 2018 Services Agreement between the Board and DLF ("DLF Services Agreement") is a written contract signed by the President, Secretary, CEO, and General Counsel of the Board and Julia Busch, DLF's Regional Director-Chicago, in April 2018. **EXHIBIT 11**, Bates BOE 1179-1206.

94. The DLF Services Agreement creates an explicit agreement between the Board and DLF for the purpose of a collaborative relationship between the parties where DLF rendered its services to implement the Quiet Time program in CPS schools.

95. The 2015 Master Services Agreement between the Board and University ("University Services Agreement") creates an explicit agreement between the Board and University establishing a collaborative relationship between those Defendants under which CPS contracts with the University to conduct and/or evaluate research projects involving CPS students, which includes students within CPS schools. **EXHIBIT 4**, Bates BOE 1231-1251.

96. Implementation by DLF of the Quiet Time program was done, in part, pursuant to authority delegated to the University by CPS under the 2015 University Services Agreement which required the University to "rigorously evaluate" new programs involving CPS students.

97. The Defendants repeatedly referred to their collaboration for the implementation of Quiet Time in CPS schools as a "partnership" or "team."

98. Chris Busch, the registered agent of DLF in its corporate filing with the Illinois Secretary of State and DLF's Regional Director for Chicago, stated in a March 27, 2017 email to Mr. Flores of CPS, that "Bogan High School will be *partnering* with us [DLF] for the 2017-2018 school year for a meditation-based program called Quiet Time." (emphasis supplied) **EXHIBIT 12**, Bates BOE 2486-2487.

99. A memorandum email sent by Bogan High School employee Margaret Loranger

states: "Please support the QT [Quiet Time] team in moving/transitioning students. We are a team." **EXHIBIT 13**, Bates BOE 2226-2227.

100.    The Board Deputy General Counsel Gabriela Brizuela wrote an email to DLF's General Counsel on September 10, 2019, stating: "…CPS will only *continue a partnership* with your organization if the ceremony component is removed from the program." (emphasis applied) **EXHIBIT 14**, Bates BOE 5018.

101.    Julia Busch states in an April 24, 2018 email to Bogan Principal Aziz-Sims: "We have truly enjoyed and value our *partnership* with you and everyone at Bogan high school." (emphasis supplied) **EXHIBIT 15**, Bates BOE 2247.

102.    DLF provided a form letter on their letterhead to communicate directly with parents and guardians of CPS students regarding the Quiet Time program. **EXHIBIT 16**, Bates BOE 3029. DLF was able to transmit that letter because CPS collaborated with DLF by furnishing parent contact information.

103.    The Board and DLF jointly operated the Quiet Time program pursuant to their "Memorandum of Understanding," signed on June 15, 2017, laying out each parties' obligations in implementing the Quiet Time program. "This agreement identifies specific responsibilities of the Services Provider (David Lynch Foundation) and School Site (Chicago Board of Education on behalf of Bogan High School)." **Bogan EXHIBIT 17 and Amundsen EXHIBIT 18,** Bates UNIVERSITY 403-407, BOE 5905-5909.

104.    CPS Principals/Administration/Leadership, faculty, and the Quiet Time Team shared in a distribution of responsibilities in implementing the Quiet Time program **EXHIBIT 19**, Bates BOE 2584, as follows:



(See also, **EXHIBIT 20,** BOE 002773-75 for further allocation of responsibilities).

105.    The University submitted the "Research Review Board Modification &

Continuing Review Application" to the Board for approval of the Quiet Time program, which

states: "The University of Chicago Crime Lab…launched the Chicago Design Competition…The

David Lynch Foundation (DLF) was selected as one of the winners and was awarded a grant to

pilot their Quiet Time (QT) Program for the first time in Chicago." **EXHIBITS 21(A)-21(F),**

Bates UNIVERSITY 18-25, 54-57, 91-101, 136-141, 158-61, 162-163, respectively.

106.    The University was obligated to perform its Quiet Time research within the

restrictions imposed by the Board under the parties' "Guidelines for External Research and Data

Collection in Chicago Public Schools" agreement. **EXHIBIT 22,** Bates BOE 2909-2971.

107.    The University conducted focus groups with CPS students in furtherance of its

Quiet Time research project. **EXHIBIT 23,** Bates University 164-170.

108.    The University provided advice to Bogan High School leadership for the school's

class period scheduling to incorporate the Quiet Time program. **EXHIBIT 24,** Bates BOE 2320-

2321.

## (4) THE DEFENDANTS' FAILURE TO SATISFY THEIR DUTIES
## TO PROTECT CPS STUDENTS

109.    The Board of Education has a duty under Illinois law, as articulated by the Illinois

Supreme Court in 1882 and 1996, to protect CPS students which arise out of its role as a public

school district:

> [I]t would be a sad commentary on our State government, if it is true, as is
> contended, there is no constitutional power in the legislature to provide, by suitable
> legislation, for [minors'] education, control and *protection*. It is the unquestioned
> right and *imperative duty* of every enlightened government, in its character of
> parens patriae, to *protect* and provide for the comfort and *well-being* of such of its
> citizens as, *by reason of infancy*, defective understanding, or other misfortune or
> infirmity, are unable to take care of themselves.

> *Am. Fed.n of State, Cty. & Mun. Emps., AFL-CIO v. Dep't of Cent. Mgmt. Servs.*,
219 Ill. Dec, 501, 805 (Ill. 1996) (quoting *McLean County v. Humphreys*, 104 Ill. 378, 383 (Ill.
1882)) (emphasis added).

110.    The University and DLF had concomitant duties to protect CPS students arising

from their contractual obligations with the Board, towards the CPS students and third-party

beneficiaries and also arising from their mutual liability as joint venturers or joint tort feasors.

111.    The 2018 DLF Services Agreement with CPS states: "Vendor [DLF] agrees to be

held to the standard of care of a *fiduciary*." (emphasis supplied) **EXHIBIT 11,** Bates BOE 1181.

112.    The 2018 DLF Services Agreement with CPS states its "Goals and Objectives" as:

"Quiet Time will positively affect the stress response enough to meaningfully impact students,

leading to reduced negative behaviors and improved academic performance." **EXHIBIT 11**, Bates

BOE 1204.

113.    The University Services Agreement pertained to the Quiet Time program and

required the University to "provide rigorous evaluation of academic and social/emotional

programs and interventions." **EXHIBIT 4**, Bates BOE 1231.

22

114.    The 2015 University Services Agreement also states: "Further, UNIVERSITY represents and warrants that it is and shall remain in compliance with all applicable Board policies and rules, including, but not limited to, the CPS Research Study and Data Policy, as such policy may be amended by Board from time to time, regarding the use of Confidential Information. **EXHIBIT 4**, Bates BOE 1239.

115.    The University Services Agreement, moreover, states: "The UNIVERSITY is primarily concerned with how programs and interventions impact a student's academic performance and other school outcomes." This contractual provision articulated, created, and further confirmed the duty of the University to protect the teenagers in CS schools from the spiritual abuse and/or legal wrong of TM. **EXHIBIT 4**, Bates 1246.

### (5) DEFENDANTS FAILED TO OBTAIN REQUIRED CONSENT IN THEIR IMPLEMENTATION OF QUIET TIME

116.    The 2018 DLF Services Agreement with CPS states its "Goals and Objectives" as: "Quiet Time will positively affect the stress response enough to meaningfully impact students, leading to reduced negative behaviors and improved academic performance." **EXHIBIT 11**, Bates BOE 1204.

117.    The University Services Agreement pertained to the Quiet Time program and required the University to "provide rigorous evaluation of academic and social/emotional programs and interventions." **EXHIBIT 4**, Bates BOE 1231.

118.    The 2015 University Services Agreement also states: "Further, UNIVERSITY represents and warrants that it is and shall remain in compliance with all applicable Board policies and rules, including, but not limited to, the CPS Research Study and Data Policy, as such policy may be amended by Board from time to time, regarding the use of Confidential Information. **EXHIBIT 4**, Bates BOE 1239.

119.    The University Services Agreement, moreover, states: "The UNIVERSITY is

23

primarily concerned with how programs and interventions impact a student's academic performance and other school outcomes." This contractual provision articulated, created, and further confirmed the duty of the University to protect the teenagers in CS schools from the spiritual abuse and/or legal wrong of TM. **EXHIBIT 4**, Bates 1246.

## (6) THE UNIVERSITY'S CONFLICT OF INTEREST

120.    The University had a contractual obligation under the 2015 Master University Services Agreement to "rigorously evaluate" its research project relating to Quiet Time. **EXHIBIT 4**, Bates 1246.

121.    The University had a conflict of interest in "rigorously evaluat[ing]" its own programs—programs enabled and coordinated for the benefit, in part, of the Chicago Urban Labs." Thus the University actually had two distinct roles in implementing Quiet Time:

121.a    The University's first role was as protector of Children—to "rigorously evaluate" any program involving CPS students both at the inception of a program and as it continued;

121.b    The University's second role, on behalf of its Urban Labs, was to conduct academic research throughout the duration of the program leading to a published study on the efficacy of TM on student behavior. Several hundred thousand dollars were paid or payable to the University by the MacArthur Foundation and other private groups to conduct the Quiet Time program. On information and belief, said funds would not have been paid to the University if the University in the course of its rigorous evaluation had advised CPS that the Quiet Time program, was illegal and/or harmful to students.

24

## COUNT I
## VIOLATION OF THE ESTABLISHMENT AND FREE EXERCISE CLAUSE
(First Amendment)
(All Defendants)

122.     Plaintiffs incorporate Paragraphs 1 through 121 as if fully restated herein.

123.     The Establishment and Free Exercise Clause of the First Amendment to the United States Constitution provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." These prohibitions apply equally to the official acts of local governmental entities, including the Chicago Public Schools and its officers and employees, through the Due Process Clause of the Fourteenth Amendment to the United States Constitution and to the private entities acting in concert with them. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922 (1982).

124.     CPS' acts to facilitate and enable the "Quiet Time" program within certain CPS schools violated the Establishment and Free Exercise Clauses for all the reasons that follow.

125.     CPS' practice coerced (within the meaning of *Doe v. Elmbrook,* 687 F.3d 840, 856 (7th Cir. 2012)) Green and others to engage in religious practices and rituals that are based in Hinduism, are Hinduism, are a religious sect labeled TM and/or are reasonably perceived by a teenager as religious and thus violates both the Establishment Clause and the Free Exercise rights of the students.

126.     CPS' practice communicates, in violation of *Doe v. Elmbrook* as set for at page 856, a message that it endorses and favors the practice of "Transcendental Meditation."

127.     CPS' practice excessively entangles the government with religion and leads to religious divisiveness in CPS schools and within the community.

128.     CPS also violated the Establishment and Free Exercise Clauses by making participation in the "Quiet Time" program effectively mandatory for Green, other students, and teachers at certain CPS schools.

129.     CPS students and teachers were told by school officials that all students must participate in the "Quiet Time" program either as active mantra meditating participants or as part of a "control group."

130.     Students who did not want to participate in the "Quiet Time" program were warned that their failure to participate could impact their grades and disqualify them from participating in their respective graduation ceremonies. Green was told her grades—and thus her eligibility to play basketball—would be negatively affected if she did not participate in "Quiet Time."

131.     Certified "Transcendental Meditation" instructors were presented by CPS to students as authority figures, and permitted to interact with students in private, without oversight from CPS employees.

132.     Certified "Transcendental Meditation" instructors repeatedly pressured, threatened, or reprimanded students who refused or were reluctant to participate in the "Quiet Time" program. Green and others were sent to the Dean's office when they complained about religious aspects of TM.

133.     Certified "Transcendental Meditation" instructors identified certain students, due to their popularity with peers, as potential assistants to influence other students to participate in the "Quiet Time" program.

134.     Certified "Transcendental Meditation" instructors offered incentives to students, including Green, in exchange for participation in the "Quiet Time" program, in the form of food, money, and other special privileges including favorable "grading."

135.     These actions undertaken by the certified "Transcendental Meditation" instructors had the cumulative effect of creating an environment that pressured students to engage in religious practices against their wills as well as explicit and tacit sponsorship by CPS.

136.     By violating the Establishment and Free Exercise Clauses as set forth above, CPS has

26

injured all Plaintiffs.

137.    By violating the Establishment and Free Exercise Clauses as set forth above, CPS has, under color of statutes, ordinances, regulations, policies, custom, or usage, deprived or threatened to deprive Plaintiffs of rights secured by the First and Fourteenth Amendments to the United States Constitution, entitling them to a remedy under 42 U.S.C. § 1983.

138.    A significant reason for the implementation by DLF of the QT program in the CPS schools was to enable and facilitate an academic study by the University on the effect of TM on student behavior.

139.    By collaborating to implement the "Quiet Time" program and accompanying academic study within CPS schools, DLF, the University and CPS jointly participated in the constitutional deprivation against Plaintiffs.

140.    Implementation of the "Quiet Time" program within CPS schools has caused Plaintiffs to experience anger, anxiety, and emotional damage. The program has pressured and coerced Green to engage in religious practices that were contrary to their personal beliefs.

### COUNT II
VIOLATION OF ILLINOIS RELIGIOUS FREEDOM RESTORATION ACT
(775 ILCS 35/1, et seq.)
(All Defendants)

141.    Plaintiffs incorporate Paragraphs 1-140 as if fully restated herein. Under the Illinois Religious Freedom Restoration Act, the "[g]overnment should not substantially burden the exercise of religion without compelling justification." 775 ILCS 35/10(a)(3).

142.    The joint actions of Defendants have substantially burdened the religious exercise rights of CPS students, and the parents and legal guardians of CPS students.

143.    Defendants will be unable to prove that implementation and facilitation of the "Quiet Time" program within CPS schools was neither in furtherance of a compelling governmental

interest nor the least restrictive means of furthering a compelling governmental interest.

## COUNT III
### BREACH OF CONTRACT AND FAILURE TO PROTECT
### ON BEHALF OF THIRD-PARTY BENEFICIARIES
#### (All Defendants)

144.     Plaintiffs incorporate Paragraphs 1 to 143 as if fully restated herein.

145.     The Board failed to uphold its common law and Illinois Constitutional Law duty

to protect CPS students which arose out of its role as a public school district:

> It is the unquestioned right and *imperative duty* of every enlightened
> government, in character of parens patriae, to *protect* and provide for the comfort
> and well-being of such of its citizens as, by reason of infancy…are unable to take
> care of themselves. The performance of this *duty* is justly regarded as one of the
> most important of governmental functions, and all constitutional limitations must
> be so understood and construed as not to interfere with its proper and legitimate
> exercise. (emphasis added). *Am. Fed.n of State, Cty. & Mun. Emps*., *AFL-CIO v.
> Dep't of Cent. Mgmt. Servs*., 219 Ill. Dec, 501, 805 (Ill. 1996) (quoting *McLean
> County v. Humphreys*, 104 Ill. 378, 383 (Ill. 1882)).

146.     The Quiet Time program and the resulting Services Agreements ("DLF Services

Agreement" and "University Agreement" as defined above in paragraphs 94 and 96, *supra*),

established or confirmed CPS students and parents as third-party beneficiaries and/or the obligation

of the public schools to protect children and properly inform their parents.

147.     Under the public policy articulated above *in McLean v. Humphreys*, when the

Defendants joined together in state action, they all owed duties to act for the benefit of CPS students

and parents in their collaborative implementation of the Quiet Time program. 104 Ill. 378.

148.     All Defendants breached their duties to Green and Gibson by violating the CPS

student's and parent's rights under the Establishment Clause and the Illinois Religious Freedom

Restoration Act.

149.     Under Illinois law, "[t]hird parties, that is, persons who are not parties to a contract,

are permitted to enforce the contract if and only if the parties made clear in the contract an intention that they be permitted to do so." *XL Disposal Corp. v. John Sexton Contractors Co.*, 659 N.E. 2d 1312, 1316 (Ill. 1995).

150.     The University Services Agreement and the DLF Services Agreement both make clear, explicitly and by context, that they are intended to benefit students and parents and confer legal recourse. *Id.*; Ill. Const. Art. 1, § 12.

## JURY DEMAND

151.     Plaintiffs demand a trial by jury on all the issues so triable.

## RELIEF REQUESTED

152.     Plaintiffs seek an order awarding them compensatory damages for the mental anguish and emotional distress and other injustices suffered in connection with the constitutional deprivations and other wrongful actions caused by the named Defendants.

153.     Plaintiffs seek an order awarding them damages, costs, and fees for violations of the Illinois Religious Freedom Restoration Act.

154.     Plaintiffs also seek an order awarding them nominal damages against all Defendants for violations of their U.S. and Illinois rights.

155.     Plaintiffs also seek an order awarding them compensatory damages against all named Defendants for breach of duty to protect under Illinois Common Law and Constitutional Law.

156.     Plaintiffs also seek an order awarding them punitive damages against Defendants DLF and The University of Chicago.

157.     Plaintiffs also request an order awarding them the costs of this action, including attorneys' fees and expenses, under 42 U.S.C. § 1988, 775 ILCS 35/20 and/or appropriate class action rules. Plaintiff also requests any other relief as the Court deems appropriate and just.

Dated: February 2, 2023

Respectfully submitted,
**MARIYAH GREEN and
SHAVON GIBSON,**

John W. Mauck (#1797328)
Judith A. Kott (# 6280395)
**MAUCK & BAKER, LLC**
One North LaSalle Street, Suite 600
Chicago, Illinois 60602
Telephone: (312) 726-1243
Facsimile: (866) 619-8661

By: s/ *John W. Mauck*
One of their attorneys